The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. You may be seated. Mr. Birch. Thank you, Your Honors. My name is Chan Cresswell and I along with my co-counsel Emma Rose Bagwell represent Mr. Shaw, the petitioner in today's case. This case was last before this court in 2023 when Mr. Shaw alleged that prison officials violated his procedural due process and his First Amendment rights by falsely accusing him of an offense, denying him access to potentially exonerating video evidence at his hearing, convicting him and using that conviction to raise his security level and transfer him to a maximum security facility. This court reversed the district court on both claims holding that there was a cognizable liberty interest in his transfer to a maximum security facility and that the official's failure to produce the video was quote profoundly powerful circumstantial evidence that perhaps they did retaliate on page 123 of the record. On remand after discovery, the district court again granted summary judgment and dismissed both claims, this time without addressing Mr. Shaw's motion for spoilation sanctions on the destroyed video evidence. This court should reverse the district court for two reasons. One, the district court abused its discretion under Wall V. Rasnick and Federal Civil Rule of Procedure 72A by failing to rule on Mr. Shaw's sanctions motion and two, in the light most favorable to the non-moving party, a reasonable jury could rule in favor of Mr. Shaw's due process and First Amendment retaliation claims. Turning to the spoilation sanctions motion, Federal Rule of Civil Procedure 72A lays out a process in which magistrate court judges have the appropriate hearings and decide the non-dispositive pre-trial matters assigned to them. When appropriate, they issue written rulings and then there can be objections. The rule requires that district court judges consider those objections and modify or set aside if the underlying ruling is clearly erroneous or contrary to law. Here, that order of operations was interrupted by the district court's decision to grant summary judgment. On January 19th, there was a motions hearing about this spoilation sanctions motion from the magistrate court judge. He ordered supplemental briefing five days later. Before getting to that point, the district court judge put a text-only docket entry saying that he was going to grant summary judgment before that spoliation motion briefing was due. And in doing so, it interrupted the flow, but in his opinion, the district court judge never addressed Mr. Shaw's spoliation sanctions motion. What relief are you seeking on your motion for sanctions? Your Honor, Mr. Shaw requested two adverse inferences. One, that the video would show that he did not commit the underlying offense. And two, that Defendant Adams had seen the video and knew that it showed that Mr. Shaw didn't commit the offense. And the reason why the spoliation sanctions motion is so important is because it goes to Mr. Shaw's claims here today, particularly that First Amendment retaliation claim. Mr. Shaw needs to show knowledge. But what relief do you want us to give? Your Honor, we'd like it to be reversed back, sent back, remanded back down to the district court for a ruling on the spoliation sanctions motion. It is important for what can be read in the light most favorable to Mr. Shaw. And this abuse, this not ruling— So you're asking for a remand for reconsideration. You're not asking us to grant, send it back for, as a matter of law, for some relief to be granted. No, Your Honor. We're asking for it to be remanded back for reconsideration on this spoliation sanctions motion and for reversal on the procedural due process and the First Amendment retaliation claims. Yes, Your Honor. Shouldn't the constitutional claims be reconsidered after the spoliation motion is ruled upon rather than simply reversing the— It seems that what you're arguing is that the two matters were taken out of order and that the spoliation motion should have been considered and ruled upon first so that the district court could consider those sanctions together with the merits of the summary judgment motions. Is that right? That's right, Your Honor. So are you asking us then simply to vacate the summary judgment motion and ask the district court to rule on it after the decision on the spoliation motion? Yes, Your Honor. That would be one way to handle it. But the spoliation motion is important for those claims. Here, the real abuse is in the district court not making a ruling and not mentioning the spoliation motion at all. In Wall v. Rasnick, Judge Wynn said that when there is no magistrate court ruling, you could look to what the district court said. But here, the district court said nothing. There was no magistrate court ruling for Mr. Shaw to object to, and then the district court didn't mention it at all. And so that leaves us in a place like this court ruled in Bailey v. Christian Broadcasting Network where it said that the factual record was not able to be reviewed. It wasn't ready for judicial review because there was no way for this court to look at the spoliation decision. There's no decision here, and Mr. Shaw wasn't even able to make objections to whatever the magistrate court judge would have decided. And that's an abuse of discretion. It should have been ruled on. And there shouldn't have been a grant of summary judgment before that was ruled on. And in that case, it should have mentioned the spoliation motion. It could have been an implicit denial, but it should have mentioned why it was an implicit denial. Although even if your spoliation request for inferences had been granted, as I read the district court's opinion, there still wouldn't have been a claim because there would be no liberty interest on the basis of the factual finding that there was no difference, really, between the conditions at the prison where he had been housed and the Red Onion facility. That is what the district court said, Your Honor, but the record does not bear that out. You can look at page 925 of the record, and that's where the VDOC themselves are making a differentiation between Sussex State Prison, where Mr. Shaw was held, and Red Onion State Prison, where he was transferred. There, the VDOC calls Red Onion State Prison a maximum security prison. Mr. Shaw's own experiences, he said that being at Red Onion State Prison meant that all inmate movement was done at gunpoint, that there was more gang control, that it resulted in more lockdowns, and the inability to contact his counsel or his family. That's on page 451 of the record. Even the defendants recognized. Defendant Leach, Defendant Foreman, and Defendant Lebeau on pages 303, 272, and 289 of the record agreed that there was a difference between Red Onion State Prison and Sussex State Prison. Defendant Leach said that those were the only two facilities that were level 5 and above. The state's classification system requiring that Red Onion State Prison be for level 5 security prisoners and above shows a differentiation between Red Onion State Prison and Sussex State Prison. And that ruling then would be unaffected by any adverse inference, even if the spoilation motion had been ruled upon. That's right, Your Honor. The district court was mistaken on this regardless. The spoilation motion really goes to the First Amendment retaliation claim and the knowledge that Mr. Shaw needs to show when we're coming to First Amendment retaliation. On this procedural due process, this court said last time that Wilkinson showed that incarceration in a maximum security prison was so atypical and significant that it gives rise to a liberty interest against any plausible baseline. That's on page 115 of the record. And it also said that maximum security facilities were those like Red Onion on page 115 of the record, those that have highly restrictive conditions. This inability to differentiate is just not bared out by the record. The defendants say that Mr. Shaw needs to point to some specific language in order for there to be a state-created liberty interest. And that is true that under Prieto v. Clark, there needs to be some state law or policy. But it's not as formulistic an inquiry as the defendants make it out to be. And in Cuma, this court said that it didn't have any problem finding that there was a state policy and a created liberty interest because there was review, annual review. After Wilkinson, the Supreme Court said that the touchstone of the inquiry is not this formulistic language drawing but rather the nature of the conditions themselves. And here, Mr. Shaw does have a state-created policy interest. At first, Your Honors, it's just a policy to not be convicted for no good reason. The fact that there is a formal process that is created by which these offenses are heard out. But further, Your Honors, you can look to page 313 of the record. Virginia DOC operating policy 831 says a formal due process hearing is required when you face the possibility of a security increase outside of the annual review cycle. Or page 929 says that security – To what extent do you think the district court did not faithfully follow the first decision? The first decision we had, and you seem to say that you should only send it back for reconsideration, but a question of whether we should reverse on the merits. Because it seems we found that there was a liberty interest in not being transferred to Red Onion. Does that have no place in your argument? No, Your Honor. I would agree with you, Judge Winn, that the district court did not follow what this court had said last time, neither here on the procedural due process or on the First Amendment retaliation claim. And to those matters, I think it would be appropriate for this court to reverse on the merits. The district court did not follow those and instead found new things to try and differentiate, like this non-differentiation factor, which isn't borne out by the record, to try and hinge its ruling on. Your Honor, looking at the First Amendment retaliation claim, it's a very similar story. Last time, all parties agreed that Mr. Shaw had engaged in protected activity and that there was an adverse action taken. Now the district court has changed its tune. On page 120 of the record, this court said last time that the district court found and the prison officials do not dispute on appeal that Mr. Shaw engaged in protected activity. And then it later said that the district court likewise found and the prison officials do not dispute that prison officials took an adverse action against Mr. Shaw. So, I mean, you have, I think, a really good argument. But at the end of the day, what the district court didn't deal with was qualified immunity. And we can go around in circles about that, maybe send it back, let them do so. But it isn't pretty clear that this action happened before our case, before the Lanier case. It was not clearly established at the time that this happened. And very likely you're not going to prevail on qualified immunity, it seems. Do you agree or disagree? I do not agree, Your Honor. I would say that Lanier was recognizing something that was already known, that this video evidence was a part of the documentary evidence that prison inmates may be entitled to under Wolf. You could look to Witt v. West Virginia State Police Troops. So to get there, we would have to find a case like Lanier that was either on point in this circuit or the Supreme Court. There is no such thing other than to say inherently this is something everybody knows. But I don't know if it rises to that level. I'm just simply, you know, it seems like we can dance around this, and it may be ultimately because of the Supreme Court, because this court didn't deal with it. We just sent it back. But at the end of the day, that is the elephant in the room in this case, whether you prevail on the merits or not, and whether we see it as a liberty of interest, whether it was invoked. But the question is going to come up, are they entitled to qualified immunity? And that's a very difficult question for you. And I'm not sure you need to argue it now, but it's the elephant in the room in terms of your client. I mean, we can go back and forth all day long, but that's what's here. Well, Your Honor, I would just point this court toward Booker v. South Carolina, in which Justice Gregory noted that a consensus of persuasive authority could show that the qualified immunity does not stand here, and that the real question is whether or not the defendants were on notice. Here, the defendants were on notice. By their own words, the defendants were on notice, that Mr. Shaw had a right to this video hearing. Is this record sufficient for us to make that determination? Here is the evidence. Sometimes we do address issues that aren't presented to the district court, because the record is so replete with evidence that we just proceed with it. We've done that. And so how do you – is that something you're asking, or is it just something you – Not necessarily, Your Honor. The district court did not find that there was qualified immunity. They did not rule on qualified immunity. And this court said last time that it didn't want to be a court of first review on the question of qualified immunity. But I will say, Your Honor, that on page 83 of the record, Defendant Murphy says in response to an informal complaint that the hearings department will advise and resolve. And on page 81 of the record, Defendant Foreman says that he won't review the rapid eye evidence, but that Mr. Shaw could request the hearings officer to do so if he'd like. That's in the record. These defendants were on notice. And lastly, Your Honor, the Third Circuit, the Seventh Circuit, and the Tenth Circuit noted that there were cases – saying this video evidence was documentary evidence in 2011, 2003, and 2007. And for those reasons, this court should reverse. Thank you. Thank you.  Good morning, and may it please the court. Tony Breckinridge for the Commonwealth of Virginia. At page 182 of the JA, Mr. Shaw describes himself as a gunner. A gunner is someone who masturbates in front of female officers at the prison. To use his own words, I am a gunner. I have been forced to reside in 4A pod. However, I will not be here – What does that have to do with compelling? He says there's a video. It seems like to me this case is all about this video. And he says, I mean, certainly what you're saying is entitled to some understanding. You have a factual account. He has a factual account. He says there's a video of it. And then he kept asking for this video, but he couldn't get it. And then ultimately it was destroyed. And after it's destroyed, he then still wants it. And he discovered it's been destroyed. But after this court makes a decision and said he's entitled to have this video, but this court doesn't address violation. I mean, your facts. We'll go ahead and deal with that. But, I mean, this is not a jury. We need to deal with the evidence. What's it got to do with this video that would have either presumably could have shown either he was doing it or not doing it? Well, Judge Winn, it has everything to do with these facts. The fact of him being an admitted gunner. The fact of him having had four confirmed charges before he was transferred. You don't need a video to say he's guilty. You can just say he's guilty because it's past conduct. Well, no, Your Honor. And if there's a video, we don't need to look at that because we already know what that video says. Is that what you're saying? No, not at all, Your Honor. I'm trying to understand it. Well, yeah, what I'm trying to get at. But I'm not giving you a chance to explain it, so go ahead and explain it to me. Because it's going to be intriguing to hear how you explain that one. At least to me, but maybe not. Well, what I'm trying to explain, Your Honor. And just to clarify, the four prior convictions were all vacated. Isn't that right? No, Your Honor. They were not. They were dismissed? They were reversed? They were erased? No, not at all. They are part of his disciplinary record. There were some that were vacated, including this one, and that's what I'm getting at, Your Honor, is that the video in the end doesn't matter. We can concede, for the purposes of this appeal, that the video would have shown that this particular instance was a case of mistaken identity, and it wouldn't change anything. Because what ended up happening was this caused them to look at his record, Mr. Shaw's record, where just months before all of this, he admitted to being a gunner who could not control himself. And then they look at his record and see that he has four prior instances of this. And then they compare that to their policy of moving gunners to prisons out west, also maximum security prisons. One thing to make sure that is ultimately clear in this is that Sussex is a maximum security prison as well. They're both Level 5 prisons, and the comparison is not accurate to say that Red Onion is somehow worse than Sussex, and that's another issue to get to a little later in the discussion. So why is that not a factual issue? Why is what not a factual issue? As to why he was moved there. Well, it's not a factual issue because there's no facts on the other side of it, Your Honor. You're saying all the facts that support this video, you've overturned that. In other words, he's gotten his remedy for that. Right. And what he went there for is something separate from this. This video has nothing to do with anything. Well, no, I wouldn't say it's separate, Your Honor. I would say it's redundant. And so that charge definitely spurred the review of his record and definitely spurred him being sent to Red Onion. There is no dispute about that. And doesn't the paperwork for the transfer specifically say that it was based on this conviction? It does say it was based on this conviction. And this conviction, had he had access to the video and had it shown what he says it would show, then there wouldn't have been a conviction. There wouldn't have been a conviction, but there would have still been the policy that gunners are transferred to Red Onion. So there still would have been a review of his record. And are gunners that have no convictions transferred to Red Onion or do they have to have a conviction for gunner? Is it based simply on a statement or is it always based on a conviction? It's always based on a conviction, but he had four. And what your statement is, is they went back to look and found these others after the conviction in 2018? Yeah, that's just necessarily part of the record. So at page JA-1089, that's the district court recognized based on the disciplinary record. And I'm forgetting the JA number, but it was Exhibit 83-1. I mean, well, it was Exhibit 1 to the Motion for Summary Judgment, which is at PACER 83-1. Mr. Breckinridge, how long has the Commonwealth known that the video is irrelevant? Well, the position of the officers at the time was that the video was irrelevant because they believed that it wouldn't show anything because the video doesn't show faces. No, no, no, no. I'm saying irrelevant. You just told us that it's irrelevant no matter what it shows. I'm saying when did the Commonwealth know that it didn't make any difference because he was being transferred because he's an admitted gunner? And he admitted he was a gunner before this incident, right? Yes, Your Honor. So how long ago? So he would have been on his way to Red Onion anyway is what you're telling us. Yeah, I think that's a fair reading of the record, Your Honor. You didn't tell the court this? I'm sorry? Why didn't you inform the court? We were in litigation, weren't we? Yes, Your Honor. And the Commonwealth was hide and seek? Well, no, Your Honor. I can't speak for – No, you have to speak for the Commonwealth because they're the only person here for the Commonwealth today. So you're telling me this is the second time here, now we know that. Oh, this was – it was unnecessary. He was a gunner. He already had the four points on him, and therefore he's on his way. So that's why we don't have to worry about the video. Well, Your Honor, that kind of gets to the whole issue of whether or not the findings of the first decision are binding on the district court. The record was not developed for the first time around. So the first time around, we didn't have all of this in the record. The motion was granted on a motion to dismiss slash summary judgment before discovery. So his disciplinary record and all of that stuff wasn't in the record. It then got put in the record after remand because we went to discovery as the court required. And then now that the information is in the record, the record reflects all of the disciplinary history, and it reflects his complaint. I thought you just told us that it was the charge, this charge, that made you say, ah, let's go back and look at his record. Ah, he has four, so it doesn't matter. You had the record. We didn't need discovery from the court. You had his record there. You're the repository of his record. You, I mean, the Commonwealth in terms of the Bureau of Corrections. So it looks like this is retaliation because of, I don't know. You should have said that a long time ago, shouldn't you? Your Honor, if I could get in my time machine and tell prior lawyers to say it, I probably would. But at the same time, the record was just not, there was no record. And so the court was going off based off of the allegations of the complaint in the prior. It seems like you're doing a whole lot of moving pieces here. You come here one time and say it's clear that this was the offense that was done. He went through, he asked for the video, and you put this man through all of these things, trying to go, calling Richmond, saying, what's going on? Why can't I have this? And then all along you knew, well, we've already checked your record. You're the only way to Red Onion anyway, and therefore we'll drop these charges and not waste court time or anybody else's time and send you to Red Onion. So now we know that, I don't know, it's kind of difficult to understand that, Mr. Parker Ridge. In either event, Judge Gregory, the transfer to Red Onion is not a change in conditions of confinement that triggers a due process violation, nor is it an adverse action that supports a personal retaliation. It's not the transfer to Red Onion is not, are you trying to say it's the same thing? Well, Your Honor, and to clarify, if the transfer had been to Red Onion SEG, the actual, like, the maximum, maximum or supermax or whatever word you want to use to define it, section of Red Onion, the Commonwealth concedes that would be a change in conditions of confinement. He was sent from the general population at Sussex 1, which houses four and five prisoners, to the general population at Red Onion, which generally houses only part five, level five people. But if one looks at the transfer orders, it actually shows that Red Onion has some threes and fours as well. And so, no, if we take a look at the record. But didn't we say in the first case that there was a liberty interest in not being transferred to Red Onion? Yes, Your Honor, based on a record that didn't exist, based on the allegations of the complaint that it is that it was something different. And based on a case in Wilkinson that describes something akin to the segregation part of Red Onion, not the part of Red Onion that he was sent to. Could he have been transferred there as a level four? I'm sorry, Your Honor? Could he have been transferred to Red Onion as a level four? I believe he could have, but I'm not 100 percent certain of that. But I'm willing to concede for the purposes of this argument that he could not have been. But that doesn't change the conditions of confinement. It actually creates a situation in which, as described in the record, Red Onion actually has more staff, and it's actually safer in many ways because of more staff. But are you arguing a different case than you did the last time you were here? Yes, Your Honor, it's on a different record. We dealt with the specifics of that case that was before us, and it seems to me this gunner business, I don't remember hearing anything about that. Is that new as a result of evidence that occurred on the remand of this? Yes, Your Honor. It's new based on the evidence that was put into the record after discovery. So we now have a totally different case. The first case being one that was dealing with the specifics of what is alleged here regarding that video. This case saying, oh, that's been overturned or it's out now, but he was going anyway because he had these other offenses. That's what we now have, but that's not the case we had. It would seem that if that's the instance, then you would simply tell the district court, maybe short of conceding, but just say, Your Honor, we recognize that that's no longer an issue in this case. We give him the remedy he wants or whatever, and overturn that basis and have the case dismissed as opposed to a judgment on it. I mean, if someone brings an action and you give them a remedy, which I don't know if overturning is the only remedy he wants, but basically you say there's no more case because what we were contending here no longer exists. I don't know. Did you say the video couldn't show one way or the other? Yeah. The Commonwealth's position has been throughout that the video wouldn't have shown anything that would have helped him anyway, and that has been the position of the prison official. But it didn't show anything to help the Commonwealth either. Correct, Your Honor. Because it showed something. Well, no, because there would be no— And the end result is we don't know because you wouldn't show the video and you didn't preserve the video. So, I mean, it's a procedural thing that seems like the only thing that makes this case important is, how do we keep this from happening again? Because it seems like common sense should have taken care of it in the first instance. But what concerns us now with Judge Greger's—I'm going to let you talk, but I want to make sure we address Judge Greger's concern and perhaps mine, and that is I feel like I'm hearing a different case than the one that was previously brought to this court. And you say, well, we develop facts on it. We develop facts, and I'm wondering when cases go back, I mean, I don't know how much a trial is— a case is retried on remand, even from a defender's perspective or from the government's perspective, and I don't think I've heard one where you said, well, that didn't matter now because there's a bunch of other stuff that he was on his way to being sent anyway, which seems like a different case to me. Well, I have a few answers to that, Your Honor, because there's a lot to unpack there. But first of all, I want to be clear that there could not possibly be any video of the incident itself because it occurred in the showers and there's no video in the showers. We would be here on a whole different case if we put video in the showers in a prison. But to be clear, in my experience in appeals, this happens all the time that when a case is remanded after no discovery, there is then discovery, a completely different factual record, and then a completely different decision that comes down after the facts have been developed. That's all that's happening here is that there's a different decision that came down after the facts were developed in discovery. Also, to get specifically to the spoliation issue, on the spoliation issue, we have a situation where, as Mr. Shaw concedes, there was a period where the magistrate had asked for supplemental briefing. The magistrate asked for supplemental briefing, says, I want supplemental briefing in five days. Three days pass, and the district court indicates in a text-only order that the district court plans to grant summary judgment. Then Mr. Shaw does not use those five days and supplement anything, does not provide the supplemental briefing, does not identify to the district court that supplemental briefing was ordered or anything like that, and so therefore has forfeited any concern about spoliation. Between that and the fact that ultimately the spoliation relief requested would not have made a difference, the spoliation issue is irrelevant because the relief they requested is a concession that it would have shown that he was not there, that it was a case of mistaken identity. As I've mentioned, that doesn't make a difference. The other thing that they've asked for I don't think would be relevant relief, which is an assumption that Mr. Adams had seen the video, but that's not a normal relief for spoliation. Does the video affect the First Amendment retaliation claim? I'm sorry, Your Honor? The First Amendment retaliation claim that's made here, does the video have any impact on that? Could it have had any impact on that? No, Your Honor, because first of all, there's no sign of the fact of the argument. First of all, there's no sign that anyone even knew about the complaint on the video, and second, importantly, there's the separate fact of this not being an adverse action to transfer him to Red Onion. He had already been at Wallens Ridge. That's in the record at 83-1. He had already been to Wallens Ridge. He went to Sussex. This transferred him to Red Onion. He spent less than two years at Red Onion, I think, then went back to Sussex, then engaged in the same conduct four or five more—three more times. I think it was three more times, as established at JA-1089, and then got transferred back to Red Onion. And now he's in Red Onion now. This is the normal course of things in prisons, is that people get transferred among populations of similar character. And in this case— I'm disturbed by your argument and, frankly, by the district court's finding that seems to entirely discount Shaw's personal experience. There was evidence on remand. There's evidence that he put into the record that his experience was different at Red Onion. And the basis of the district court's finding entirely disregarded that evidence, and that strikes me as an issue of material fact. Well, Your Honor, I don't think it is an issue of material fact for two reasons. First of all—or in two ways. So first of all, it is merely a scintilla insofar as he's talking about things that are generally not—are somewhat fantastical, like the notion that there's a gun pointed at him everywhere he goes. And that's disputed in the record, and it's also not to be credited, I don't think. Isn't that the role of a jury, to decide whether evidence should be credited? Only if evidence is at least somewhat credible. I do think that there is a gatekeeping function for the district courts on things like that. And second, none of this amounts to a change in conditions of confinement. Complaints about not having a microwave or not having ice dispensed, that's not a change in conditions of confinement strong enough to create a right that requires a particular amount of due process or to call it retaliation. It's not a change in conditions of confinement. It is at most something of an inconvenience. But there is evidence in the record establishing that things like more lockdowns and things like that are not issues that involve—are not credible based on the facts of the case and based on the facts of the confinement at Sussex and at Red Onion and at Wallens Ridge. And so that might be one of the reasons that a lot of the focus is on this description of Red Onion as maximum versus Sussex as a five, but that description elides the real issue, which is that he was sent to the five area of Red Onion. He has not seen the max area of Red Onion. Well, he alleges that there was more exposure to gang violence, more restriction to his cell, more being held at gunpoint. That's not having access to a microwave. Well, I agree with that, Your Honor, but at the same time, it's also not a change in conditions of confinement. A change in conditions is not being confined to his cell more than he was previously? That's not a change in conditions? Not to the extent that it is just—I'm running out of time. May I have leave to answer your question? You may. All right. Not to the extent that it is an incremental or anecdotal belief as to more time in a cell as opposed to a policy of the prison system where the policies are similar to the same as established at pages JA355 through 358? It's not just policy. It's population, what he's talking about. He's saying that there's going to be more times where you're going to be locked down because of the nature of the population. Exposure because of the nature of the population. It's not policy. You live with the population of the people. Maybe you have to abide by some of the policies, but you live with the population. That's what he's talking about in the sense that he said you got to move around. You have guns. You have weapons, I should say. You have weapons and that kind of thing. It's just interesting that the case is sort of . . . I don't know. Once you get to the point that this is just an administrative matter, I can't see why the Commonwealth didn't inform the district court or whoever and say, listen, Mayor Coper, this charge against him has nothing to do with it. This case is over. This is an administrative matter or transferred due to his prior behavior and his self-classification as a gunner. Therefore, there's no reason that this should continue. I just don't understand why that wasn't done a long time ago. Now, Mr. Berkowitz, I know you as a great attorney and honorable and that kind of thing and you have to argue what you have, but to come and tell us all this now, a new horizon about this case and the context is really befuddling. But anyway, with that, unless my colleagues have further questions. Just one quick question. Qualified immunity, you're seeking that only on due process, on the due process claim? No, Your Honor, we'd seek it on both of the claims. All right. Thank you, Mr. Berkowitz. Now, if I'm correct, this is Ms. Bagwell. Yes, Your Honor. Right. Your Honors, beginning with defendant's argument that Mr. Shaw's transfer was based on a history of this type of behavior, the record simply does not support that contention. In fact, it shows on page 652 in the institutional classification authority hearing notification form that his transfer was based on, quote, an administrative transfer based on 137 conviction. And the word conviction there is singular. There is no evidence that other past behavior was considered in the choice to raise his security level in order to transfer him to Red Onion State Prison. In fact, his last charge was two years prior. And in the reclassification security level score sheet documented in the record at JA 650, nothing is checked for behavior beyond this singular conviction. Were the prior convictions overturned? Your Honor, multiple of the prior convictions were overturned. Notably, the ones that were not were two years prior to this 137 conviction. And at no point in those two years did defendants make any decisions to increase Mr. Shaw's security level. It was only after this specific conviction that those proceedings began and that the increase in his security level was raised and that he was ultimately transferred. If it's right that the prison officials, I'm moving to the First Amendment issue because we didn't have a lot of time to talk about it. If it's right that the prison officials met their burden to establish a valid explanation for the transfer, which let's just take for a minute, suppose that they did, is there evidence in the record that suggests that that explanation is improper? Yes, Your Honor, because the defendants were aware that Mr. Shaw had this right to request the documentary evidence and there is evidence that they were on notice, that he repeatedly sought that and that they retaliated against him for repeatedly writing to them, requesting that information. He also wrote to the warden of the prison as well as to Karen Stapleton at the BDOC. And those letters and messages were responded to by these various defendants. For example, Defendant Foreman marked that he was not going to review the rapid eye, but that he received the complaint, as well as Defendant Leibov and Defendant Adams. So to the question of whether the defendants were on notice, they simply were in this case. They were responding to these complaints and interacting with them, and they knew without a shadow of a doubt that Mr. Shaw was requesting that footage. But the way the burden shifting works, he has to state that he experienced an adverse action, then the burden shifts to the government to provide a reason for the action, and then the burden shifts back for him to say why that reason isn't the actual reason. And here you're saying, well, there were sort of two separate things happened, but I'm finding trouble connecting the two. Yes, Your Honor, your point is well taken. But Mr. Shaw's contention here is that he should have never had his security level increased because but for the defendant's failure to review that video footage, they would have been unable to raise his security level and ultimately transfer him. Notably, there was some debate earlier as to whether a Level 4 inmate could be transferred to Red Onion. They could not. It was only by raising his security level to Level 5 that they could then transfer him. And going to what the video would have shown, Mr. Shaw claims that it would have shown him not even in the area of the subject behavior, in fact, sitting on the stairs rather than in the showers. So this is not just a case of a mistaken identity between inmates who were in the showers, but rather Mr. Shaw claims that he was not visible at all in that footage. What's confusing me, and maybe I just need you to help me on a factual thing here, is I understand it seems like the government is arguing, well, all of that conduct that you are saying gave rise for him to go to Red Onion, that's been overturned or that's not the basis. After we did discovery, he was sent there for all these other reasons, of which is not part of this video or any of that incident there. Is that what's being argued here? Your Honor, it does seem that it is the government's contention that it is just because of Mr. Shaw's history and self-identification as a gunner that he was ultimately transferred. But, again, the record simply does not reflect that. Well, the question is, just because he had done that, to sort of play it down, it seems to be only because. Because what they're saying is we – I didn't use the word concede. That probably would have helped if you had said concede. But we're basically saying that's not the conduct he was sent there for. He was sent there for this conduct. And if the trial court, upon remand, would you have any concern as to whether the trial court can take in additional evidence that would support that he was going there, I guess, anyway, or this was sufficient to do it? Your Honor, we would not be opposed to the trial court making additional findings on that. But, again, the record is sufficient today to decide that it was but for this singular conviction. Again, a history of nothing in the two years prior, and then the temporal proximity within a few weeks that his hearing occurred and that his security classification was increased. And one more thing to address here as far as – That – I mean, that's it. But I'm saying we've got to look at the record. It was but for this conduct. He said it's not but for because we basically said, no, we're giving that up. This is the basis right here. This is the only evidence here. It's kind of odd when it comes back on appeal because the first time we came around, it was pretty much this was it. It seems to me the second time after you do get all this evidence in, you say, no, we'll concede that that's not enough. But this did it. So how do you counter that? Your Honor, I see that my time has expired. May I briefly answer your question? Yeah, you may. It does seem in this case that course has changed and that now the argument is that it's this history of gunning that has led to the increase in security classification and the ultimate transfer. But, again, because the record at JA-652 indicates that it was this singular charge that led to Mr. Shaw's security level increase and because he was not afforded adequate due process at his hearing by the prison officials refusing to produce that video footage and because, as this court already recognized last time, it was an adverse action for him to be transferred to Red Onion, we would ask this court to reverse. Thank you. Thank you, Ms. Bagwell. Mr. Birch, you didn't introduce your students. Yes, Your Honor, I'm sorry. Yes, yes, we always like to know. We already know how fine they are and how well they did. So now just tell us, you know, from which they hail and where are they studying? Sure, Your Honor. This is Chang Cresswell. He's a third year at the University of Georgia. He's going to be a public defender after he graduates. And this is Ms. Bagwell. She's also a 3L at the University of Georgia. She's going to be a private practice after she graduates as well. All right. Well, good to have you here. And as always, you're court appointed. And we, on behalf of the Fourth Circuit, want to thank you for your services. We depend on lawyers like yourselves who come and help us and try to deal with these challenging cases, and we appreciate it very much. And obviously, Mr. Breckenridge, we appreciate your representation of the Commonwealth. With that, we'll come to our Greek Council and proceed to our next case.
judges: Roger L. Gregory, James Andrew Wynn, Nicole G. Berner